Moses Ruth, grandfather to the Complainants, Ruth and Jane, purchased for them, about 1756, a tract of land in Rowan County, which was surveyed by virtue of a warrant in their names, as the orphans of Robert M'Cusition, deceased, and either paid the purchase money, or left it with the Defendant Jane, their mother, then a widow. She, acting as guardian to her daughters, who were infants, obtained in 1760, a grant from Lord Granville, in her own name, with full knowledge that the land was paid for and surveyed for them. The Defendant Jane, intermarried in 1765, with Thomas Blair, and they executed a deed for the lands to James Archer, who, it is charged, had full notice of the preceding circumstances. James Archer died in 1799, after having made his will, and devised the lands to certain of his children. This is the statement made in the bill.
The history of the transaction is altogether different as given in the answer of Thomas Blair and Jane (590) his wife; who say, that Moses Ruth did not purchase the lands for the Complainants, Ruth and Jane, and that no money was paid to them, or any other person, for that purpose; but that the lands had been entered and surveyed by Robert M'Cuistion, in his life time, but the title was not completed, nor was there any money paid by him. That upon the sale of his effects after his death, this entry was purchased by his widow Jane, who, in endeavoring to procure a grant upon it, discovered that it had lapsed, and she was therefore obliged to re-enter it in her own name: that by a mistake of *Page 370 
the agent, the entry was made in the name of the heirs of Robert M'Cuistion, which mistake the widow tried to get rectified, but was told it was immaterial, and that the grant would be issued in her own name, which was accordingly done: that the land was sold to James Archer, and the price paid, before her intermarriage with Thomas Blair, but that afterwards, she and her husband executed the deed to him jointly. It is further stated, that the Complainant, Ruth, was of age in 1774, and unmarried, and that Jane was of age in 1776, and that before her marriage with the Complainant, Short, she had been married to Alexander Nelson, who together with the Complainants, Robert Thompson and wife, set up a claim to the land, about 1779.
The devisees of Archer, in their answer, say that their testator was a purchaser of the lands for a valuable consideration, without notice of Complainant's claim.
Some additional statements appear in the bill of revivor, which are, that Jane, the Defendant, not having been privily examined when she executed the deed to Archer, the title, upon her death, developed upon her heirs, who are her issue by Thomas Blair. These issue, in their answer, rely upon the answer filed by Thomas Blair and wife, and require the Complainants to be put to the proof of the illegality of their mother's conveyance.
The Jury have found, that the conveyance from (591) Lord Granville to Jane M'Cusition, was fraudulently obtained upon an entry to which the Complainants, Ruth and Jane, were entitled; and the questions before this Court are, 1st. Whether as the grant forms a part of Defendant's title, and shews upon the face of it, to have been made according to the certificate of survey annexed to it, such survey being in the names of the Complainants, Ruth and Jane, amounts to notice of their equitable? 2d. Whether the Complainants are barred of relief by length of time?
As to the first question. Where land is sold without warranty, or with warranty only against the feoffor and his heirs, the purchaser is entitled to all the deeds as incident to the land, to enable him to defend it. 1 Co. 1. The special warranty which Blair and his wife made to James Archer, entitled him to the possession of the grant; it formed part of his title, and it is to be presumed he received it. It is a well established rule in this Court, that where a purchaser, in the necessary deduction of his title, must use a deed which leads to a fact shewing an equitable title in another, he will be affected with notice of that fact. As where *Page 371 
a person took a mortgage from one who claimed the land under a will, by which it was encumbered with legacies, the mortgagee could not deduce his title without the will, and therefore shall be chargeable with notice, although the devisee had levied a fine to the use of himself and his heirs. He shall be presumed to know it, although in fact he may be ignorant of it; for his ignorance must be the effect of gross negligence. Hence this kind of constructive notice is founded upon evidence of so satisfactory, a kind, that it is held to be incontrovertible: so that if a man, upon the purchase of land, has a deed put into his hands, which recites a title in some other person, he will not be allowed to prove that he did not read the deed, or that he was ignorant of the recital. And even if a person purchase lands with notice that they are contracted to be sold to another, and take the deed to his son and his heirs, though the (592) son had no notice of the contract, yet the notice to the father shall effect him. 1 Ch. Ca. 38. 2 Vern. 662. 2 Anstruther 438.
The rule may be applied to many cases in which it would probably produce much hardship; as where many deeds were to be examined in the investigation of a complicated title, a person might overlook or forget the fact, with the knowledge of which he is charged. But when James Archer purchased from Blair and his wife, the only title they had, was contained in the grant from Earl Granville, and it was impossible to inspect that without knowing or having reason to suspect, that it ought to have issued in the names of Ruth and Jane M'Cuistion. When to this is added, that Archer had an immediate right to the possession of the grant, no regret can be felt at the application of the rule to this case, since it so fully accords with its justice.
As to the second question. James Archer, having, then, purchased the land with notice of this combination of trust and fraud, he and all volunteer claimants under him, must take the land, subject to the Equity, to which it was liable in the possession of Blair and wife; and if the lapse of time would bar the Complainants against them, it must do so against the Defendants. They claim under a purchase made by their ancestor fifty years ago, during part of which time, one of the Complainants was of full age and unmarried, and forty years have elapsed since she arrived at age: the other Complainant reached her full age nearly forty-five years ago, and has been twice married. About 1779, the Complainants, Ruth and Jane, with their husbands, *Page 372 
set up a claim to the lands, and soon afterwards abandoned it, or remained silent about it. No reason is given in the bill, why they have slept so long upon their rights, nor is their acquiescence in the Defendants' possession for the rest of this long period, in any wise accounted for. In this view of the case, it would be entirely just that the Complainants should be (593) denied relief, unless they are protected by the rule that trust and fraud are not within the statute of limitations. The rule with respect to a trust is, that if it be constituted by the act of the parties, the possession of the trustee is the possessions of the cestui que trust, and no length of such possession will bar: but if a party is to be constituted a trustee by the decree of a Court of Equity founded in fraud or the like, his possession adverse, and the statute of limitations will run from the time that the circumstances of the fraud were discovered. A fraudulent transaction, from the secrecy with which it is usually conducted, may remain for a long time unknown to the injured party; and it would be unconscientious to allow the Defendant to avail himself of the statute during such a period. But after the discovery of the fraud, a new right of action is given to the party affected by it, and there is no reason for requiring a suit to be prosecuted at law, and barring the Plaintiff if he neglect it, which does not equally apply to a Court of Equity. In 3 Peere Wms. 143, it is said, "If the fraud was known and discovered above six years before exhibiting the bill, this though a fraud, would be barred by the statute of limitations." In Weston v. Cartwrite
(Select Cas. in ch. 34), it was held, that notwithstanding a fraud, the Court, after a length of time, ought not to investigate the subject. It is said by a great Chancellor, that Courts of Equity have constantly guided themselves by this principle, that wherever the legislature has limited a period for Law proceedings, Equity will, in analagous cases, consider the equitable rights as bound by the same limitations. 2 Schl. Lef. 632. The hardship and injustice with which a contrary rule might operate against executors, administrators, legatees, and innocent persons claiming under a fraudulent party, is much considered in 2 Ves. jun. 92.
Upon this ground, therefore, the Complainants must fail, because the discovery of the fraud was made many years since, and, indeed, it was of a nature that could not (594) be concealed. It would be a most alarming precedent to investigate transactions after so great a lapse of time, when the fraud imputed was committed before the birth of those who are now called upon to answer it, and *Page 373 
when no reason is shewn for the delay. The bill must be dismissed.
Cited: Holmes v. Holmes, 86 N.C. 209; Johnson v. Prairie, 91 N.C. 163;Justice v. Blair, 93 N.C. 408; Summerlin v. Cowles, 101 N.C. 478;Academy v. Bank, Ib., 489.